Lee S. Harris (SBN 76699)
Michael W. Flynn (SBN 247501)
GOLDSTEIN, GELLMAN, MELBOSTAD,
GIBSON & HARRIS, LLP
1388 Sutter Street, Suite 1000
San Francisco, CA 94109-5494
Tel.: (415) 673-5600
Fax: (415) 673-5606

Attorneys for Plaintiff
EDITH McCARTHY

E-filing

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDITH McCARTHY,<br><br>   Plaintiff,<br><br>   v.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, K. HOVNANIAN COMPANIES, LLC<br><br>   Defendants. | Case No. CV 08 1888<br><br>COMPLAINT FOR:<br><br>RECOVERY OF ERISA PLAN BENEFITS [29 U.S.C. § 1132(a)(1)(B)] |

### JURISDICTION

1.  This court has jurisdiction over this action, under 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) (ERISA), irrespective of the amount in controversy or the citizenship of the parties.

### VENUE

2.  Venue is proper because the Northern District of California is the federal district in which the Plan was administered and where the breach occurred. 29 U.S.C. § 1132(e)(2).

### PARTIES

3.  Plaintiff Edith McCarthy is, and at all relevant times herein was, an individual residing in Sacramento County, California.

1.

38234B.doc: 6442-00                                              Complaint for Recovery of ERISA

4.  Defendant The Prudential Insurance Company of America (hereinafter "Prudential") is, and at all relevant times herein was, an insurance company with principal offices located in Newark, New Jersey. At all relevant times, Prudential was duly registered and authorized to do insurance business in the State of California and regularly conducted substantial insurance business in this state. Whenever references are made to Prudential engaging in any act or having knowledge of any fact, such allegation shall be deemed to include any action taken or fact known individually by any officer, employee, agent, or representative of Prudential or its subsidiaries, acting with actual or apparent authority.

5.  Plaintiff is informed and believes, and thereon alleges, each defendant named herein acted in concert and participated in the acts and omissions alleged herein, and that each defendant was acting with the consent of the other defendants within the scope of their authority as an agent, employee, servant, partner, joint-venturer, or other representative, and was jointly responsible with each other defendant for such acts and omissions.

**FACTS**

6.  On July 1, 2002, Ms. McCarthy began working for Forecast Homes, which was later subsumed on about March 1, 2003, by K. Hovnanian Companies, LLC ("Hovnanian"), a real estate brokerage firm. McCarthy worked as a real estate sales agent in new home sales.

7.  Over the next several months, Ms. McCarthy experienced problems with memory, judgment, attention span deficit, distractability and concentration. In November, 2003, Dr. William Au performed a neurological evaluation confirming these symptoms, and attributing them to a sleep disturbance.

8.  In March, 2004, an MRI study indicated the presence of a white matter lesion (vascilitis infarction) in the high left posterior parietal lobe. Further examination revealed a necrotic lesion on Ms. McCarthy's arms and hands.

9.  On April 20, 2004, Dr. Shawn Aghili reported on the results of a sleep test, indicating that Ms. McCarthy was not experiencing REM or slow-wave sleep, which precluded a diagnosis of a sleep disorder.

10. On April 21, 2004, Dr. Au reassessed Ms. McCarthy, opining that she had a

2.

rheumatologic syndrome based on her high anticardiolipin antibody titer.

11. In May 2004, Rheumatologist Dr. Kenneth Weisner diagnosed Ms. McCarthy with antiphospholipid antibody syndrome (Sneddons syndrome). Depression and lumbar stenosis were secondary diagnoses.

12. On July 17, 2004, Psychologist Dr. Cohen performed a large battery of psychological and mental examinations on Ms. McCarthy including: the Wechsler Adult Intelligence Scale –III, the Wechsler Memory Scale – III, the Wechsler Individual Achievement Test – II, Test of Memory Malingering, Rey Complex Figure Test and Recognition Trial, Trail Making Test (Trails and B), Thurstone Word Fluency Test, the Seashore Rhythm Test, the Stroop Color Word Test, the Boston Naming Test, the Minnesota Mutliphasic Personality Inventory – 2, and others. Based on this comprehensive battery, Dr. Cohen concluded that Ms. McCarthy's impaired mental functioning may impact her success in a very demanding and high-stress profession. Dr. Cohen was careful to point out that, although Ms. McCarthy performed adequately overall on the tests, that those test scores that were markedly lower (math skills, visual/auditory discrepancies) supported a finding of an "organically based cognitive disorder." That is, while Ms. McCarthy scored well relative to the average scores, *her* scores were indicative of a decline in *her* mental functioning.

13. Based on Ms. McCarthy's medical information, Long Term Disability (LTD) benefits were approved through October 11, 2004.

14. On November 11, 2004, Prudential's Disability Consultant, Lorena Ross, advised Ms. McCarthy in writing that review of her claim for LTD benefits was continuing "as [Prudential's] medical department must first review [Ms. McCarthy's] medical records, and that Prudential anticipated that this review would be completed by November 18, 2004.

15. The same day, November 11, 2004, Prudential's Disability Consultant, Lorena Ross, sent Ms. McCarthy a letter stating that Prudential had completed their review of Ms. McCarthy's file, and that Prudential was denying LTD benefits. Prudential effectively disagreed with Ms. McCarthy's treating physicians, and concluded that Ms. McCarthy had gotten better. Specifically, the reviewing physician for Prudential disregarded the brain lesion as irrelevant.

16. On December 18, 2004, Dr. Holmer wrote to Prudential, indicating that the review

3.

performed by Prudential "while thorough, missed the degree of disability she has. I noted that the review, for example, dismissed the significance of her rain lesion, as seen on the MRI, as not likely to be clinically relevant. On the contrary, the location of he lesions in her left parietal lobe would be expected to have a significant impact on her visual-spatial skills. She has demonstrated problems with recognition, math balance and word-finding, which are essential to her occupation."

17. On December 19, 2004, Ms. McCarthy appealed Prudential's denial of her LTD benefits claim.

18. On February 9, 2005, Prudential denied Ms. McCarthy's appeal, contending Ms. McCarthy was not disabled under the Plan.

19. On July 25, 2005, Ms. McCarthy submitted a second appeal. She cited to the second and third opinions of Drs. Geoffrey Quinn and Donald Kitt, each of which confirmed the diagnosis of Sneddons syndrome and the resulting disability.

20. On August 3, 2005, Arnold Wolfe, M.D., confirmed he had been treating Ms. McCarthy for "Major Depressive Disorder" precipitated by Sneddons Syndrome. Dr. Wolfe further confirmed that "As a result of her illness, Mrs. McCarthy has been unable to work and cannot function at her previous occupational levels and those necessary to continue in her employment."

21. On September 28, 2005, Prudential **approved** Ms. McCarthy's LTD benefits effective November 6, 2004.

22. On May 11, 2006, Prudential assured Ms. McCarthy it would "not apply the mental illness limitation to dementia if it is a result of stroke, trauma, viral infection, Alzheimer's disease or other conditions not listed which are not usually treated by . . . treatment standardly accepted in the practice of medicine."

23. On August 14, 2006, Dr. Jonathan D. Cannick administered a comprehensive battery of tests, including the same tests administered by Dr. Cohen in 2004. Dr. Cannick noted that "[Ms. McCarthy's] disorder extends beyond cognition such that a diagnosis of Organic Brain Syndrome is warranted. Presently, Ms. McCarthy's results span from the 3rd to the 99th percentile range for persons her age, more than a 4 [Standard Deviation] difference! While her results do not reflect

wholesale or pervasive losses and deficiencies, this is a picture of a dramatic disruption giving rise to highly variable and unpredictable ability. In addition to the loss of energy and initiative, the alteration and deficient in psychomotor activity, and the slowed processing ability, the lack of predictability and consistency creates a disabling influence and she no longer a reliable employee. While not grossly impaired or disabled her condition was of sufficient severity to warrant the loss of her driving license." Last, Dr. Cannick confirmed that Ms. McCarthy's "alteration in general neuropsychological functioning likely precludes her from successfully performing the duties associated with being a real estate agent in new home sales."

24. On October 13, 2007, Prudential requested an "independent" file review from William Barr, PhD.

25. On November 2, 2006, Dr. Barr provided Prudential a copy of his file review.

26. First, Dr. Barr indicated that he "would like to state the limits of the conclusions provided at the end of this letter, which are not based on direct examination of the claimant, but rather a review of medical, psychological and other types of records."

27. With regard to Dr. Cohen's review, Dr. Barr agreed that the findings were "not at a level that would traditionally be labeled as 'impaired.' Notably, Dr. Barr did not comment on Dr. Cohen's explanation that Ms. McCarthy's scores were higher than the average, but exhibited impairment in her.

28. Dr. Barr noted that, "Much of the objective data obtained in this examination appears to have been neglected or ignored in favor of the examinee's subjective symptoms."

29. With regard to the WAIS-III scores reported by Dr. Cannick, Dr. Barr noted that these scores were comparable to those obtained in 2004.

30. With regard to the MMPI-2 test performed by Dr. Cannick, Dr. Barr disregarded the impact of those scores, noting that "The results were of questionable validity as a result of elevations of the L-Scale (T-71) and the Lee-Haley FBS (Raw Score = 27)." Dr. Barr relied on these measures to conclude that Ms.McCarthy, like others involved with litigation, was exaggerating symptoms for "secondary gain."

31. In explaining a score that did not comport with his conclusion that there was a lack of

5.

impairment, Dr. Bar noted that "reduced scores on that test was not necessarily linked to the presence of underlying brain dysfunction as similar scores are often seen in patients experiencing subtle features of cognitive dysfunction secondary to mood disturbance." Notably, Dr. Barr did not explain Dr. Kenneth Weisner's diagnosis that Ms. McCarthy's mood disturbances were secondary to her Sneddons Syndrome.

32. On November 9, 2006, Prudential terminated Ms. McCarthy's LTD benefits effective November 6, 2006, contending Ms. McCarthy was not disabled, according to Dr. Barr's file review. Prudential did so despite the fact that there had been no improvement or change in Ms. McCarthy's medical condition documented by any health care professional who treated or met her from the time Prudential acknowledged that she was totally disabled. Specifically, Prudential had approved LTD benefits for Ms. McCarthy based on test scores received from Dr. Cohen in 2004 that showed nearly identical impairment that the test scores received from Dr. Cannick in 2006 did.

33. On March 21, 2007, Arnold Wolfe, M.D., again confirmed Ms. McCarthy "was no longer able to continue her real estate employment that depended both on verbally interacting with clients as well as considerable physical activity in showing property."

34. On April 9, 2007, Dr. Cannick responded to Dr. Barr's review. Dr. Cannick first noted that that Dr. Barr's findings were based on a "blind analysis" of Ms. McCarthy "without benefit of direct examination of the patient." Dr. Cannick further noted Dr. Barr was "cherry-picking" findings and that Dr. Barr had misrepresented and misinterpreted the results of two evaluating neuropsychologists that met with and assessed Ms. McCarthy.

35. Dr. Barr had not explained how Ms. McCarthy's "self-reported difficulties" were somehow invalid given that her physicians, for years, had been treating her with appropriate medication, and how the brain lesion, abnormal antibody tests, abnormal psychological test results, and other observations of her doctors had simply been "self-reported." That is, Dr. Cannick posed the question of, if her symptoms were truly all in her head, then why had so many doctors for such a long time treated her.

36. Further the TOMMS test performed by Dr. Cohen contraindicated the presence of

38234B.doc: 6442-00                                                                                                    Complaint for Recovery of ERISA

symptom exaggeration.

37. Dr. Cannick noted that Dr. Barr had placed great emphasis on the Lees Haley FBS scale in order to conclude that Ms. McCarthy was exaggerating. Dr. Cannick explained that this test should "not be used in clinical settings nor should it be used during disability evaluations to determine malingering."

38. Dr. Cannick noted a gross discrepancy between the findings of Dr. Barr and Prudential's decision. Specifically, Dr. Cannick noted that Ms. McCarthy had been diagnosed with Sneddons Syndrome, and the brain lesion and other medical evidence supported that diagnosis. However, Prudential concluded that "the medical evidence has not definitely validated Ms. McCarthy's diagnosis of Sneddons Syndrome.

39. Dr. Cannick further debunked Dr. Barr and Prudential's conclusion that her symptoms were simply related to her depression. Dr. Cannick noted that her verbal-visual differences could not have been caused by emotional/psychological disorders, which do not lateralize. Where severe depression occurs, test results are typically uniformly suppressed, whereas Ms. McCarthy exhibited high variability in her results.

40. On May 2, 2007, Ms. McCarthy appealed the claim denial.

41. On May 30, 2007, Prudential advised Ms. McCarthy that it had scheduled her for an Independent Neurological Evaluation (INE).

42. On June 14, 2007, Ms. McCarthy advised Prudential it had failed to cite any policy provision that permitted it to conduct a post-denial IME, and so she would not participate.

43. On June 26, 2007, Prudential communicated its position that ERISA did not preclude a post-denial IME, and it was responding to Ms. McCarthy's claim that her disability was not caused by mental illness. Further, if Ms. McCarthy failed to attend, then Prudential would proceed with the claim review based on the evidence in the file.

44. On July 12, 2007, Prudential wrote to Ms. McCarthy, seeking the "raw data" from Dr. Cannick's most recent neuropsychological evaluation. According to Prudential, "privacy laws" forced it to destroy the raw data after Dr. Barr had reviewed it. Prudential apparently had only destroyed this raw data; it still had all the other medical evidence, including other raw data,

regarding Ms. McCarthy in its files. Prudential further advised that it would proceed with the administrative review by July 20, 2007, if it did not receive the raw data.

45. On July 19, 2007, Ms. McCarthy responded to Prudential, pointing out that it was puzzling that Prudential had destroyed the raw data from Dr. Cannick, but had not destroyed any other data. Thus, Ms. McCarthy reiterated her position that the original claims denial was based on evidence never reviewed.

46. On September 7, 2007, Ms. McCarthy wrote to Prudential seeking the status of her appeal. Ms. McCarthy pointed out that her appeal had been mailed on May 2, 2007, and that Prudential had attempted to extend its 45-day review period by seeking the INE and the raw data from Dr. Cannick that had been "destroyed." However, Prudential had indicated that it would continue its review on July 20, 2007 if it did not receive the raw data. Ms. McCarthy pointed out that September 7, 2007 was over four months after the original appeal date, and over 45 days after July 20, 2007.

47. On September 11, 2007 Prudential denied Ms. McCarthy's appeal. In its denial letter, Prudential parroted the reasoning of Dr. Barr, stating that the test scores did not affirmatively prove impairment. With regard to the fact that those test results contained scores with 4 standard deviations, Prudential cited to research by Schretien et al., which indicates that a difference of 4 standard deviations is not "unusual." Prudential posited that "the variability that she does have with her performance is likely associated with an emotional reaction that she having to her medical illness coupled with her perfectionist style. ... She obviously does have various medical problems, but these problems are not producing evidence of neurocognitive impairment.

## Social Security Disability Insurance Benefits

48. On June 7, 2005, Ms. McCarthy filed an application for Social Security Disability Insurance Benefits, alleging disability beginning May 10, 2004.

49. The claim was denied, and Ms. McCarthy filed a timely request of hearing on March 28, 2006. The hearing took place on May 9, 2007 before Administrative Law Judge L. Kalei Fong in Sacramento.

50. On July 25, 2007, Judge Fong issued a fully favorable Notice of Decision. In that

1  Decision, Judge Fond made findings of fact and conclusions of law.

2  51.  Judge Fong chronicled Ms. McCarthy's medical history, and identified that Ms. McCarthy had been a real estate agent before her disability. Judge Fong, "after careful consideration of the entire record," found that "the claimant has residual functional capacity to perform a limited range of sedentary work activity; however, she cannot sustain a combination of sitting, standing, or walking, nor concentration, persistence, pace or personal interaction to perform even the minimal demands of this type of work activity of right-hours a day, five days of the week."

52.  Judge Fong expressly gave consideration to the reports of the State Agency medical consultants, who had opined that Ms. McCarthy was capable of light tasks which involve occasional postural activity. Judge Fong found that the updated medical information showed a continuation of debilitating symptoms that clearly demonstrated that Ms. McCarthy was more severely diminished by both physical and mental impairments and was likely to continue as such on an indefinite basis. Judge Fong found this conclusion consistent with the longitudinal record.

53.  Judge Fong approved the award of disability benefits.

54.  On July 31, 2007, Ms. McCarthy forwarded to Prudential the Social Security Administration (SSA) Office of Disability Adjudication and Review's disability benefits decision with findings of fact and conclusions of law.

## FIRST CAUSE OF ACTION

(Recovery of ERISA Plan Benefits)

55.  Plaintiff realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 54, above.

56.  The Plan is an employee benefit plan covered by ERISA. 29 U.S.C. §§ 1001-1461.

57.  Ms. McCarthy was a covered participant in or beneficiary of the Plan at the time of her disability.

58.  Ms. McCarthy performed her obligations under the Plan.

59. Defendants refusal and failure to pay monthly LTD benefits is improper and in violation of the terms of the plan.

60. Defendants' failure to perform under the Plan was not justified or excused.

61. The claims and appeals procedures provided under the Plan have been exhausted.

62. Prudential improperly denied Ms. McCarthy's benefits based on the single review of one doctor who never met Ms. McCarthy, never treated Ms. McCarthy, and who selectively cherry-picked medical evidence from a large file to support his conclusion that Ms. McCarthy was able to function. The main basis for Dr. Barr's conclusion was that Ms. McCarthy's test scores were overall high, and that Ms. McCarthy had dramatically reported her symptoms.

63. However, this reasoning is too simplistic – it ignores the fact that Ms. McCarthy was always an extremely functional and capable person before her disability. Further, this conclusion ignores that those test results that were lower (math skills, visual/auditory discrepancies) were consistent with the organic cause: the brain lesion and Sneddons Syndrome. In 2006, Dr. Cannick similarly observed that, while most scores were generally high, those that were a full 4 standard deviations off supported that Ms. McCarthy suffered from an organically based disability that precluded her from working a as a real estate agent.

64. Further, Dr. Barr noted that the test scores from Dr. Cannick's 2006 examination were substantially similar to those reported in 2004 by Dr. Cohen. In 2004, Prudential considered Ms. McCarthy completely disabled as was properly paying her claims. Prudential has never articulated why it determined that Ms. McCarthy was disabled in 2004, but not disabled in 2007, when its own reviewing physician reported that her test scores had not changed.

65. Judge Fong reached a similar conclusion in 2007 when Judge Fong found, as a matter of fact, that Ms. McCarthy was unable to perform her occupation.

66. Prudential has ignored years of medical evidence from doctors who met and directly treated Ms. McCarthy in favor of a single report by Dr. Barr. Prudential's fiduciary obligations require it to fully investigate a claim, and rely on all evidence, not simply the evidence that supports a claim denial.

67. Prudential failed to abide by its own appeals deadlines and those required by ERISA

when it failed to render a decision on her appeal in a timely manner.

68. Prudential acted under a conflict of interest.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows:

1. Damages in an amount to be determined at trial;

2. Interest, attorney fees, and costs, under 29 U.S.C. § 1132(g)(1); and

3. Such other and further relief as the Court may deem just and proper.

Dated: April 7, 2008.

GOLDSTEIN, GELLMAN, MELBOSTAD,
GIBSON & HARRIS, LLP

_____
Lee S. Harris
Michael W. Flynn
Attorneys for Plaintiff
EDITH McCARTHY

11.

38234B.doc: 6442-00                                  Complaint for Recovery of ERISA